**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 190317-U

Order filed April 12, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0317 Circuit No. 13-CF-896 |
| | ) | |
| CORTEZ D. WILLIAMS, | ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Albrecht and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: The court did not err in summarily dismissing the defendant's postconviction petition at the first stage of proceedings.

¶ 2     The defendant, Cortez D. Williams, appeals from the first-stage dismissal of his postconviction petition. He argues that his petition was erroneously dismissed where he pleaded the gist of claims that his right to counsel of choice was violated and his trial counsel provided ineffective assistance.

¶ 3                                    I. BACKGROUND

¶ 4         The State charged the defendant with first degree murder for the shooting death of Melvin

Sanders (720 ILCS 5/9-1(a)(1), (2) (West 2012)). The court appointed counsel to represent the

defendant. A jury trial was set for February 3, 2014. On January 24, 2014, defense counsel moved

to continue, indicating that they had made good progress in preparation but were not yet ready to

proceed to trial. The motion to continue was allowed and the trial was continued to March 10,

2014.

¶ 5         Leading up to March 10, the defendant had indicated in all of the pretrial conferences that

he was ready to proceed to trial as scheduled. However, on March 10, 2014, approximately 30

minutes prior to the start of trial, the defendant moved to continue to retain private counsel.

Defense counsel represented that the defendant had spoken with his family the day before and

learned that they had just gathered the necessary funds to retain private counsel and the defendant

had learned this information after the pretrial conferences in which they indicated they were ready

to proceed. The court inquired about whether an attorney had been hired to represent the defendant

at this point. The defendant stated that his family had secured the funds but had not yet hired an

attorney.

¶ 6         The State announced that it was ready to proceed to trial. The court expressed its frustration

and need for clarity, stating:

            "I asked, not an hour ago: How many witnesses will there be? How long will this

            take? Are there police officers involved? Are there people's schedules involved?

                   And the answer was: It will take at least a full day of testimony.

            Everybody's ready. ***

And now within the last five minutes, the Court is informed that the defendant isn't ready. *** If you had come in here and had your attorney that you had paid and made your arrangements or whatever the arrangements were, and he or she came in here and entered their appearance, it would be a different story.

But all we are now is like some sort of random telephone call that: Whoop, stop. Stop the train. We might have some money and we might have a lawyer, but we don't know who it is or whether they would take the case or whether I would like them or whether he or she would like you and get to the case. And then we're back in the ditch again starting from the very beginning. That seems disingenuous to me.

So are you able—is your client able to tell me that, yes, they have an appointment to see a lawyer, who the lawyer is? Are they going to be here this morning or is this just take my word for it, Judge?"

The court indicated that the situation was "[w]ay too blurry" and it needed to know more specifics before it could rule on the motion. The court recessed proceedings for defense counsel to obtain more information.

¶ 7    When the case was recalled, defense counsel indicated that he spoke with the defendant's mother. She informed counsel that they had not secured the funds to hire private counsel but were still in the process. The defendant's mother believed that she could retain counsel for the defendant within two weeks. She indicated that she believed the amount of money she was attempting to secure would be enough to retain private counsel, but she did not indicate that she had spoken with any attorney regarding the defendant's case. Based on this representation, the court expressed an opinion that the request was not realistic and denied the motion to continue.

3

¶ 8        The case proceeded to trial. Antonio Hardy testified that on September 21, 2013, at approximately 11 p.m., he was sitting in his white truck playing music for a family gathering when he saw a man shooting while standing over Sanders. Hardy witnessed two gunshots being fired. The shooter fled the scene on foot. Hardy followed the shooter, eventually running him over with his truck. Thereafter, Hardy observed the shooter limp into a grey Monte Carlo. Hardy followed the Monte Carlo. During the pursuit, the Monte Carlo slowed, and an individual exited from the passenger side. That individual then entered a small vehicle. Hardy did not recall the color of the vehicle but thought it might have been red. The Monte Carlo continued on, and Hardy followed it for several miles before the police intervened.

¶ 9        During cross-examination, Hardy testified that Sanders was a member of his family. Hardy had not been drinking alcohol that night but had taken his prescribed Vicodin. He indicated that it was dark outside at the time of the incident. Hardy also indicated that he only witnessed two gunshots being fired, and he had not heard or seen any gunshots prior to those.

¶ 10       The defendant testified on his own behalf. He described an incident which occurred on September 13, 2013, where he first encountered Sanders. On that date, the defendant spoke with a group of women on Stanley Street for approximately 15 or 20 minutes before leaving. The defendant returned to the area approximately 45 minutes to an hour later, armed with a firearm for his protection. The defendant again approached and spoke to the women. The defendant claimed one woman asked him "Who was talking shit," and then the defendant heard a man say, "Who's talking shit?" The defendant did not know this man, but later learned he was Sanders. Sanders asked one woman if they knew the defendant. When she responded that she did not, Sanders punched the defendant in the jaw.

¶ 11    According to the defendant's testimony, after being punched, Sanders and another man approached him. He believed he was going to be attacked, so the defendant pulled out his firearm and held it at his side. When Sanders saw the defendant's gun, he opened his jacket and said "Oh, we got those too." The defendant said that at the time he thought he saw the butt of a gun because something black was sticking up on Sanders's hip. The defendant explained that, after this exchange, he walked back to his car and returned home. The defendant indicated that he felt scared during this encounter as Sanders was larger than him.

¶ 12    The defendant testified that, on September 21, 2013, he drove his girlfriend's Monte Carlo into the same area near Stanley Street. The defendant testified that he was armed for self-defense. He parked the Monte Carlo on a nearby street and exited the Monte Carlo to talk with a woman. After she left, the defendant began walking back to the Monte Carlo down Stanley Street. The defendant saw a group of people outside of a home on Stanley Street and hesitated before deciding it was safe to walk by the house. While walking by this group, the defendant heard Sanders say, "what's up." Sanders was bent at the shoulders holding a bottle and had his other hand in his jacket pocket. The defendant then observed Sanders make a "pulling out motion" like his hand was coming out of his jacket pocket. The defendant thought Sanders was reaching for a gun "because [the defendant] pulled a gun out on him, so [the defendant] thought [Sanders] was going to pull a gun out on [him]." Consequently, the defendant pulled his gun out and began shooting while moving backwards. The defendant denied that he stood over Sanders while shooting. The defendant fled to avoid the returning gunfire; a white truck struck him as he ran. The defendant stood up, entered the Monte Carlo, and fled with the white truck in pursuit until the police stopped him approximately 15 minutes later.

¶ 13     Other evidence established that the defendant had driven a maroon-colored car on September 13, 2013, and at least six gunshots were fired on the evening of the murder, September 21, 2013. During closing arguments, defense counsel argued that Hardy's testimony was unreliable where the incident occurred at night, he was unable to identify the shooter, and he only heard two gunshots. Defense counsel highlighted other forensic evidence including the number of gunshots and the bullet trajectories to attempt to impeach Hardy's credibility. The State focused heavily on the defendant's testimony and his video recorded statement to the police to argue premeditation. The State did not reference any other occupant of the Monte Carlo or their entering a red-colored vehicle. Instead, the State focused on the fact that the defendant used another vehicle that the group would not associate with him that night and parked it on a neighboring block before proceeding on foot to Stanley Street.

¶ 14     The defendant was convicted of first degree murder and sentenced to 60 years' imprisonment. On direct appeal, the defendant argued that the court erred in prohibiting the jury from receiving evidence that the police discovered a concealed handgun on Sanders's body and the court erred when it refused to instruct the jury on self-defense. We affirmed the defendant's conviction. *People v. Williams*, 2016 IL App (3d) 140380-U, ¶ 52.

¶ 15     In January 2018, the defendant filed a postconviction petition alleging, *inter alia*: (1) the court denied his constitutional right to counsel of his choosing when it denied his request for a continuance to retain private counsel and (2) trial counsel was ineffective for failing to impeach Hardy with an inconsistent statement made during his videotaped interview where he told police that no one exited the passenger side of the Monte Carlo. Moreover, the defendant argued that appellate counsel was ineffective for failing to raise these issues. The court entered an order summarily dismissing the defendant's petitions. The defendant appeals.

6

¶ 16                                    II. ANALYSIS

¶ 17        The Post-Conviction Hearing Act creates a procedure for imprisoned criminal defendants to collaterally attack their convictions or sentences based on a substantial denial of their constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2018). "At the first stage, the court must accept as true and liberally construe all of the allegations in the petition unless contradicted by the record." *People v. Walker*, 2019 IL App (3d) 170374, ¶ 13. A defendant need only state the gist of a constitutional claim, which is a low threshold. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). "At this stage, a defendant need not make legal arguments or cite to legal authority." *Id.* "If the trial court finds in the first stage of proceedings that the petition is frivolous or patently without merit, it shall summarily dismiss the petition ***." *People v. Moore*, 2018 IL App (3d) 160271, ¶ 15. A petition is considered frivolous if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-13, 16 (2009). Any issues that could have been raised in the direct appeal, but were not, are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443 (2005). The circuit court's first-stage dismissal of a postconviction petition is reviewed *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 18                        A. Denial of the Right to Counsel of Choice

¶ 19        The defendant argues his petitions presented the gist of a claim that he was denied his constitutional right to counsel of his choosing when the court denied his motion to continue to hire private counsel. Further, the defendant argues that the issue is not subject to forfeiture as appellate counsel provided ineffective assistance where they failed to raise the issue on direct appeal.

¶ 20        Criminal defendants are guaranteed the right to retain counsel of their choice by both the United States and Illinois Constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. This right, while fundamental, may be forfeited where it is used to "delay trial and thwart the effective administration of justice." *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008). A court's

7

determination on whether to allow a continuance for substitution of counsel will not be overturned absent an abuse of discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000).

¶ 21    "Factors to be considered by a reviewing court in evaluating a trial court's exercise of discretion include (i) defendant's diligence; (ii) defendant's right to a speedy, fair, and impartial trial; and (iii) interests of justice." *People v. Adams*, 2016 IL App (1st) 141135, ¶ 15. "In balancing the judicial interest of trying the case with due diligence and the defendant's constitutional right to counsel of choice, the court must inquire into the actual request to determine whether it is being used merely as a delaying tactic." *People v. Burrell*, 228 Ill. App. 3d 133, 142 (1992).

¶ 22    An abuse of discretion may be found when the circuit court fails to further inquire into the defendant's request for a continuance for new counsel. *People v. Basler*, 304 Ill. App. 3d 230, 232-33 (1999). However, the court "will not be found to have abused its discretion *** in the absence of ready and willing substitute counsel." *Segoviano*, 189 Ill. 2d at 245. Accordingly, no abuse of discretion will be found "where a trial court conducts an inquiry into the circumstances of a defendant's motion, and those circumstances demonstrate substitute counsel does not stand 'ready, willing, and able to make an unconditional entry of appearance' on defendant's behalf." *People v. Curry*, 2013 IL App (4th) 120724, ¶ 51 (quoting *People v. Koss*, 52 Ill. App. 3d 605, 607-08 (1977)).

¶ 23    The defendant argues that this case is analogous to *People v. Adams*, 2016 IL App (1st) 141135. In *Adams*, a bench trial was scheduled 70 days after the defendant was indicted. *Id.* ¶ 12. On the day of trial, the defendant requested a continuance to secure private counsel, explaining that he was asking because his attorney did not "let [him] know anything." *Id.* ¶ 4. The circuit court quickly denied the defendant's motion, stating "[i]f this wasn't the day of trial, then you would have a right to do that. But this is the day of trial and everybody is here. So your request is

8

denied." *Id.* The appellate court found that the circuit court abused its discretion in denying the defendant's continuance where it failed to make any inquiry into the defendant's reasons for wanting new counsel or any efforts he may have made toward obtaining counsel. *Id.* ¶ 17. The appellate court further noted that the charge had only been pending for 70 days on the day of trial, the defendant had requested no prior continuances, and the defendant had been in custody during the pendency of the proceedings. *Id.*

¶ 24   Here, the defendant had moved to continue a prior trial date. The defendant expressed no reason as to why he was seeking to obtain new counsel and the charge had been pending for nearly six months at the time of trial. As with *Adams*, the court was clearly concerned with the timing of the request and the inconvenience to the witnesses. However, the court was also concerned about the lack of diligence on the defendant's part. It found the request to be disingenuous where it came after the parties had announced they were ready for trial, and minutes before jury selection was set to begin due to an ambiguous telephone conversation. Nonetheless, the court determined it did not have enough information and recessed the case to have trial counsel speak with the defendant's family to inquire if anyone had spoken with an attorney, who the attorney was, and whether they would be available to appear.

¶ 25   Defense counsel was able to determine and inform the court of the circumstances surrounding the defendant's request for a continuance. The court's inquiry, through defense counsel's investigation, clearly revealed that no attorney had been consulted or hired to represent the defendant. Further, contrary to the defendant's initial representation, his family had not secured the funds to hire an attorney. On the date of trial, they were still attempting to secure the funds, clearly illustrating that no attorney stood willing and ready to represent the defendant. The record establishes that the court did not abuse its discretion in denying the defendant's motion to continue

9

to obtain new counsel. Thus, it is not arguable that the defendant was denied his constitutional right to counsel of his choosing and appellate counsel did not provide ineffective assistance where it failed to raise a meritless issue. See *People v. Johnson*, 205 Ill. 2d 381, 406 (2002) ("Appellate counsel need not brief every conceivable issue and may refrain from developing nonmeritorious issues without violating *Strickland* [citation], because the defendant suffered no prejudice unless the underlying issue is meritorious.").

¶ 26                                 B. Ineffective Assistance of Counsel

¶ 27        The defendant argues that his petition contained the gist of a claim that trial counsel was ineffective for failing to impeach a State's witness with a prior inconsistent statement. At the first-stage, a postconviction petition that alleges ineffective assistance of counsel may not be summarily dismissed if it is arguable that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17. "[F]ailure to satisfy either prong precludes a finding of ineffective assistance of counsel." *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 28        "Counsel's failure to impeach a witness is generally considered a matter of trial strategy and will not support a claim of ineffective assistance of counsel." *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24. However, counsel may be found to have provided ineffective assistance where he "completely fails to use significant impeachment evidence to impeach a key witness." *Id.*

¶ 29        Taking the defendant's affidavit as true, Hardy gave inconsistent testimony regarding whether another individual exited the Monte Carlo that the defendant was driving and entered another, potentially red, vehicle after the shooting occurred. The record reflects that trial counsel cross-examined Hardy about his relationship with Sanders and any potential intoxication at the

time of the offense but asked no questions about his prior inconsistent statement regarding a passenger in the Monte Carlo. Trial counsel may arguably be ineffective for failing to use this impeachment evidence if it was significant. However, this impeachment evidence is not significant.

¶ 30    Most of Hardy's testimony was corroborated by the defendant's own testimony. Hardy testified that he witnessed a man shoot Sanders. The shooter fled on foot. Hardy, in his white truck, followed the shooter and eventually struck him with his truck. The shooter then entered the driver's seat of a Monte Carlo and Hardy continued to follow that vehicle for miles. The defendant admitted to shooting Sanders and leaving the scene on foot. The defendant testified that he was struck by a white truck and drove away in a Monte Carlo, where he was followed by that white truck until the police intervened. Thus, the evidence renders the prior inconsistent statement insignificant. Accordingly, it is not arguable that trial counsel's decision not to use insignificant evidence to impeach Hardy fell below an objective standard of reasonableness, rendering the claim meritless. Where the underlying claim has no merit, no prejudice will result. *People v. Pitsonbarger*, 205 Ill. 2d 444, 465 (2002).

¶ 31                            III. CONCLUSION

¶ 32    The judgment of the circuit court of Peoria County is affirmed.

¶ 33    Affirmed.